**DEFENDANT'S EXHIBIT 9**



Not Reported in F.Supp.2d                                                                                              Page 1
Not Reported in F.Supp.2d, 2002 WL 99745 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d, 2002 WL 99745)**

**H**
Wilson v. Sundstrand Corp.
N.D.Ill.,2002.
Only the Westlaw citation is currently available.
United States District Court, N.D. Illinois, Eastern Division.
Lynda WILSON, et al., Plaintiffs,
v.
SUNDSTRAND CORP., Defendants.
Herry ROSIDIN, et al., Plaintiffs,
v.
SUNDSTRAND CORP., Defendants.
**No. 99 D 6944, 99 C 6946.**

Jan. 25, 2002.

MEMORANDUM OPINION AND ORDER

KENNELLY, District J.
*1 These actions stem from the crash of Garuda Indonesia Flight GA-152 in Indonesia in September 1997. Defendant Sundstrand Corporation is alleged to have manufactured the aircraft's ground proximity warning system, which plaintiffs allege was defective and which they claim caused the crash. Both cases were filed in state court, and Sundstrand removed them to this Court in October 1999 based on diversity of citizenship.

Defendant seeks summary judgment on the grounds that the plaintiffs lack capacity to sue. As an initial matter, we question whether a claim of lack of capacity would provide an appropriate basis for summary judgment; it would appear that dismissal of the plaintiff's complaint, not summary judgment, is the appropriate action to take when a plaintiff lacks capacity to sue. *Cf. Whitcomb v. Ford Motor Co.,* 79 F.R.D. 244, 245 (M.D.Pa.1978) (Rule 17 contemplates dismissal of action not brought by real party in interest).

Each of the German plaintiffs (Dieter Thieme and Thorsten Muller) has submitted documents that, according to plaintiffs' German law expert, identifies the particular plaintiffs as the sole heir of certain of the deceased German passengers and confers upon him the authority to bring suit on behalf of the deceased. Affidavit of Ulrich von Jeinsen ¶¶ 10-12. Defendant's German law expert does not contest these opinions. Rather, he focuses on the absence of court action, stating that none of the German plaintiffs has been appointed by a German court as administrator, executor, or guardian of the estate of the deceased person that he claims to represent. Affidavit of P. Nikolai Ehlers ¶¶ 9-14. But defendants' expert does not indicate that German law provides for a procedure to appoint an administrator in cases such as these; indeed, he states that German law "does not recognize the concept of a personal representative of a decedent."*Id.* ¶ 9. According to plaintiffs' expert, under German law, an administrator may be appointed only if the deceased's assets are insufficient to pay his creditors; an executor is appointed only if the deceased had a will; and a guardian is appointed only if the heirs are unknown. None of these conditions exist with regard to the deceased German passengers. *See* Supplemental Affidavit of Ulrich von Jeinsen ¶¶ 8-10.

Each of the Italian plaintiffs (Francesco Gammuto and Adone Borghi) was granted power of attorney by all of the heirs of a deceased Italian passenger to act as representative of the deceased's estate. According to plaintiffs' Italian law expert, Italian law authorizes this procedure and confers upon the recipient of the power of attorney the authority to bring suit on behalf of the deceased. Affidavit of Gianvincenzo Lucchini ¶¶ 4-8. As with the German plaintiffs, defendant's Italian law expert does not contest this; rather he points out that no court approved the power of attorney or entered an order conferring authority on the power of attorney's recipient, and he argues that the documents in question were not properly notarized. Affidavit of Filippo Muratori ¶¶ 5-12. But as with the German plaintiffs, defendants do not suggest that any other procedure exists under Italian law for authorizing a

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d  Page 2
Not Reported in F.Supp.2d, 2002 WL 99745 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d, 2002 WL 99745)**

person to bring suit on behalf of a deceased. And the Court is satisfied that the documents have been properly notarized.

**\*2** Things are a bit more complicated with respect to the plaintiffs purporting to represent the deceased Indonesian passengers. Plaintiffs' expert in Indonesian law states that with regard to deceased Indonesians who are of the Muslim faith, a religious court declares the identity of the heirs of the deceased and determines the order of distribution of the estate. With regard to non-Muslims, the National District Court has similar authority. The court with responsibility over the particular decedent issues a document which, according to plaintiff's expert, has the effect under Indonesian law of conferring power and authority on the part of a designated person to act on behalf of the deceased; this, according to plaintiffs' expert, confers the authority to bring a lawsuit as the representative of the deceased. Plaintiffs' expert says that each of the Indonesian plaintiffs has the necessary documentation which under Indonesian law authorizes them to bring suit on behalf of the deceased person that they purport to represent. Affidavit of Elly Erawaty ¶¶ 2-11.

Defendant's expert on Indonesian law, like its experts on Italian and German law, focuses on the lack of court appointment of the plaintiffs as administrators of the deceased persons' estates. But his carefully-worded affidavit does not describe any established procedure under Indonesian law to appoint an administrator to bring a lawsuit on behalf of a deceased person.[FN1] He claims that any of the Indonesian plaintiffs could apply to an Indonesian court to obtain a declaration authorizing them to act on behalf of the deceased for the purpose of filing suit, *see* Affidavit of Andrew Sriro ¶¶ 25-26, but on careful examination it is clear that he is claiming that an Indonesian court's general authority is likely to be broad enough to authorize this, not that any such procedure actually exists under Indonesian law. *Id.* ¶¶ 20-23. But beyond the issue of court appointment, defendant's expert contends that the documents that the Indonesian plaintiffs have tendered are not sufficient to give them the right to sue: he says that if suit is brought on behalf of a deceased Indonesian, under Indonesian law all heirs must join as plaintiffs or must grant power of attorney to a particular heir or representative. *Id.* ¶ 17. Based on the current record, it does not appear that any of the Indonesian plaintiffs has obtained power of attorney from all the heirs of the particular deceased.

> FN1. Though defendant's expert states that Indonesian law permits a testator to designate a person to administer his estate, *see* Affidavit of Andrew Sriro ¶ 11, that is beside the point, as there is no indication that any of the deceased Indonesian passengers had done so.

The issue of plaintiffs' capacity to sue is governed by Illinois law. Fed.R.Civ.P. 17(b). The various plaintiffs purport to represent citizens of Germany, Italy, and Indonesia. They have brought claims under the Illinois Wrongful Death Act and the Illinois Survival Act. The Wrongful Death Act provides a cause of action for the benefit of a deceased person's surviving spouse and next of king to compensate them for their losses. 740 ILCS 180/1 & 2. The Survival Act permits the filing of an action to recover damages for the deceased person's injuries prior to death. 755 ILCS 5/27-6; *Patch v. Glover,* 248 Ill.App.3d 562, 573, 618 N.E.2d 583, 592 (1993).

**\*3** Defendant argues that because none of the plaintiffs is the court-appointed administrator of the estate of the deceased person that he or she purports to represent, each of them lacks capacity to sue. Neither the Wrongful Death Act nor the Survival Act, however, expressly requires the plaintiff to receive a court appointment as a prerequisite to suit. The Wrongful Death Act requires that the action be brought by the "personal representatives" of the deceased, 740 ILCS 180/2; a single heir cannot bring an action under the statute. *In re: Estate of Harnetiaux v. Hartzell,* 91 Ill.App.2d 222, 227, 234 N.E.2d

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 99745 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d, 2002 WL 99745)**

Page 3

81, 83-84 (1968). To avoid multiple lawsuits, the statute requires that a single action be brought on behalf of all persons entitled to recover. *Pruitt v. Jockisch,* 228 Ill.App.3d 295, 298, 591 N.E.2d 942, 944 (1992). But the statute's language does not require that the personal representative in all cases be court-appointed.

The same is true of the Survival Act. The statute, which is part of the Probate Act, does not itself provide for a cause of action; rather it states that certain types of actions survive a person's death. 722 ILCS 5/27-6. It says nothing about who can bring suit on behalf of the deceased. Defendant relies on another provision of the Probate Act which states that if no letters of administration are issued in Illinois on the estate of a non-resident decedent, letters of administration issued by a court of competent jurisdiction of any other state, territory, or country will permit the recipient of the letters to sue in Illinois. 755 ILCS 5/22-3. But this statute does not *limit* who can sue; its self-evident purpose is to *permit* non-resident representatives to bring suit. Defendant relies on cases which state that "only the administrator or executor of a decedent's estate, and not the decedent's survivors, can maintain an action" under the Survival Act, *e.g., Wilmore v. Stibolt,* 152 Ill.App.3d 642, 504 N.E.2d 916, 918 (1987), but none of those cases involved a deceased person who was a citizen of a foreign country.

The purpose of the "personal representative" requirement in these statutes is twofold: to ensure that the person bringing the wrongful death / survival action is authorized to do so, and to avoid a multiplicity of suits. It is likely that when the Illinois legislature enacted the Wrongful Death Act and the Survival Act, it took as its governing premise the proposition that other legal systems would have some mechanism similar to Illinois' procedure for court appointment of an administrator. Conversely, it is reasonable to assume that the legislature did not make a survey of the law of the various countries of the world and did not come to a decision that only some of those countries had procedures sufficient to permit a plaintiff to sue in Illinois courts. There is no basis to believe that the legislature intended to bar the door of the Illinois courts to persons who, under the law of a foreign legal system different from our own, are fully and properly authorized to sue on behalf of a deceased person. If a foreign legal system lacks a procedure for appointment of an administrator of an estate but has some other mechanism which accomplishes these purposes, we see no basis to require more and do not believe that the Illinois courts would require more if faced with the issue.

*4 Based on the materials submitted to the Court, the German, Italian, and Indonesian legal systems lack a procedure for appointing a special administrator or the equivalent in matters such as these, but each of them has a mechanism for ensuring that the person acting on behalf of the estate is authorized to do so, and is the sole person authorized to do so. The German and Italian plaintiffs have complied with these procedures. The Indonesian plaintiffs, however, are missing an element that defendant's expert says is critical: a power of attorney from all of the heirs of the deceased authorizing the plaintiff to file suit. Because that claim was made in defendant's reply, plaintiffs have not had a chance to address it.

Though the Indonesian plaintiffs must provide more (either a response definitively showing that defendant's expert is wrong on the point we have cited, or proper powers of attorney as defendant's expert describes) in order to convince the Court that they are proper representatives, neither summary judgment nor immediate dismissal is appropriate. Rather, the appropriate course is to allow plaintiffs a reasonable time to rectify the defect or convince the Court that it does not exist. *Cf. Audio-Visual Marketing Corp. v. Omni Corp.,* 545 F.2d 715, 719 (10th Cir.1976) (action not brought by real party in interest should not be dismissed until plaintiff has been given reasonable time to remedy the defect); *Executive Jet Aviation, Inc. v. United States,* 507 F.2d 508, 514-15 (6th Cir.1974) (giving real parties

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 99745 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d, 2002 WL 99745)**

Page 4

in interest opportunity to join action).

Plaintiffs, seeking extra protection, have moved this Court to appoint them as special administrators. These motions are denied. A federal court lacks the authority to appoint a special administrator. *See Coleman v. McLaren,* 590 F.Supp. 38, 39 (N.D.Ill.1984). If plaintiffs want a court in this country to appoint them as special administrators, they must go to state court. It may be wise for them to do so irrespective of our ruling that it is not necessary. Though the Court is confident of its ruling, there is no reason why plaintiffs should incur the risk of an erroneous decision.

Conclusion

For the reasons stated above, defendant's motion for summary judgment [docket item 36-1] is denied. Construing the motion as a motion to dismiss, it is denied as to the German and Italian plaintiffs, and held in abeyance as to the Indonesian plaintiffs. The Indonesian plaintiffs have until February 5, 2002 to file a memorandum on the issue described in the body of this Opinion, and until March 22, 2002 to file the "power of attorney" documentation described in the Opinion. Plaintiffs' motions for appointment of special administrators [items 63-1 & 65-1] are denied. Plaintiff's motion to strike [item 64-1] is likewise denied. The case is set for a status hearing on February 1, 2002 at 9:30 a.m. for the purpose of setting a discovery cutoff date and a trial date.

N.D.Ill.,2002.
Wilson v. Sundstrand Corp.
Not Reported in F.Supp.2d, 2002 WL 99745 (N.D.Ill.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**<u>DEFENDANT'S EXHIBIT 10</u>**



Slip Copy
Slip Copy, 2008 WL 896196 (C.A.7 (Ind.))
(Cite as: Slip Copy, 2008 WL 896196)

Page 1

**H**
**Ingalls** v. The **AES** Corp.
C.A.7 (Ind.),2008.
Only the Westlaw citation is currently available.This case was not selected for publication in the Federal Reporter.Not for Publication in West's Federal Reporter See Fed. Rule of Appellate Procedure 32.1 generally governing citation of judicial decisions issued on or after Jan. 1, 2007. See also Seventh Circuit Rule 32.1. (Find CTA7 Rule 32.1)
United States Court of Appeals,Seventh Circuit.
Dwane **INGALLS**, Plaintiff-Appellant,
v.
THE **AES** CORPORATION, Defendant-Appellee.
No. 07-3086.

Submitted April 2, 2008.[FN*]

FN* After examining the briefs and the record, we have concluded that oral argument is unnecessary. Thus the appeal is submitted on the briefs and the record. FED. R.APP. P. 34(a)(2).

Decided April 2, 2008.

Appeal from the United States District Court for the Southern District of Indiana, Indianapolis Division. No. 1:07-cv-0104-DFH-TAB, David F. Hamilton, Chief Judge.

Dwane Ingalls, Greenwood, IN, pro se.
Kenneth J. Yerkes, Barnes & Thornburg, Indianapolis, IN, for Defendant-Appellee.

Before MICHAEL S. KANNE, Circuit Judge, ILANA DIAMOND ROVNER, Circuit Judge, and DIANE S. SYKES, Circuit Judge.

**ORDER**

*1 In January 2007 Dwane Ingalls brought this diversity action against The **AES** Corporation, claiming that **AES** breached a contract for the sale and purchase of stock options and committed fraud in relation to that contract. **AES** moved to dismiss or stay these proceedings in favor of parallel state proceedings. The district court granted the motion to stay the federal suit, finding that a state suit Ingalls had filed against **AES** in July 2004 was parallel and that abstention was proper under the doctrine established in *Colorado River Water Conservation Dist. v. United States,* 424 U.S. 800 (1976). We affirm.

Ingalls began his career at **AES** in 1990. In January 2001 Ingalls accepted a transfer to work for the Indianapolis Power and Light Company (IPL), which **AES** was in the process of acquiring, as a vice president and business unit leader. At about the same time, **AES** began having financial problems. In late 2001 **AES** asked its officers, including those working at its subsidiaries, to voluntarily give up their 2001 cash bonuses and accept reduced base salaries for 2002 in exchange for **AES** stock options that would vest in 10 years. Ingalls allegedly accepted this offer, giving up his $50,000 bonus for 2001 and $55,000 of his $125,000 base salary for 2002.

In the spring of 2003, Ingalls became concerned about the leadership at IPL as well as the effect of **AES**'s financial problems on IPL and IPALCO Enterprises, Inc. (IPALCO), IPL's holding company. After voicing these concerns to IPL's Chief Executive Officer, Ann Murtlow, and to others, Murtlow fired Ingalls in March 2004, allegedly because Ingalls had lost faith in the company's leadership. When Ingalls was formally terminated, he refused to sign the separation agreement that **AES** proposed, losing any severance pay and stock options to which he would have otherwise been entitled.

In November 2004 Ingalls contacted **AES** to request that the stock options he had purchased at the end of 2001 be issued to him. He was told that these options were subject to **AES**'s general stock option policy under which all rights to options terminate 180 days after an employee leaves the company. Ingalls alleges that this was the first time he heard that the options offered for purchase in 2001

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2008 WL 896196 (C.A.7 (Ind.))
**(Cite as: Slip Copy, 2008 WL 896196)**

Page 2

were subject to the general stock option policies.

Meanwhile, in July 2004 Ingalls filed suit against AES, IPALCO, IPL, and Murtlow in Indiana state court. His amended complaint alleged four causes of action, two of which are relevant here. First, he claimed that when the defendants terminated him they breached an implied 10-year employment contract that was supposedly created when he accepted the 2001 stock option offer because, he argued, he had to be employed with AES for the options to vest, which took 10 years. Second, he claimed the defendants failed to pay him all of the wages owed him, including the stock options he bought as part of the 2001 offer. In November 2006 the state court granted partial summary judgment to the defendants on the wages claim because Ingalls had not first filed an administrative grievance as required by law.

*2 In January 2007 Ingalls filed this suit in federal district court, alleging three causes of action based on the 2001 stock option offer: (1) breach of contract for the purchase of stock options, (2) fraud, and (3) state securities fraud. The district court granted the defendant's motion to stay the federal court proceedings. The court first held that the two suits were parallel because two of the state claims and all of the federal claims "revolve around the same transactions involving the ten year stock options" and Ingalls had "simply asserted some new theories for relief" stemming from events central to his state case. The court then applied the 10-factor test we have established for determining whether *Colorado River* abstention is appropriate, concluding that most of the factors weighed in favor of abstention.

On appeal Ingalls argues that the district court abused its discretion in holding that the state and federal cases are parallel. He contends that the two suits are not parallel because he is seeking redress in the state case for different stock options than those at stake in the federal case. He also disputes whether the district court applied the proper rules for determining if cases are parallel. Finally, Ingalls frivolously contends that AES conceded in a discovery letter that the stock options in the federal case are not part of the state case.

Abstention under the *Colorado River* doctrine is reserved for exceptional circumstances in which a stay of federal court proceedings in favor of concurrent state court proceedings would promote "wise judicial administration" out of recognition that federal courts have a "virtually unflagging obligation" to exercise the jurisdiction given them. *Colorado River*, 424 U.S. at 817 (internal quotation marks and citation omitted); *see Clark v. Lacy*, 376 F.3d 682, 685 (7th Cir.2004). District courts must conduct a two-part inquiry to determine if abstention is appropriate. *Tyrer v. City of South Beloit*, 456 F.3d 744, 751 (7th Cir.2006). First, the court considers whether the state and federal suits are parallel. *Id.;Clark*, 376 F.3d at 685. If the court concludes that the suits are parallel, the court then considers several non-exclusive factors to determine if exceptional circumstances exist to justify abstention. *Tyrer*, 456 F.3d at 751;*Clark*, 376 F.3d at 685.

Whether the two suits are parallel is a legal issue that we review de novo.*AAR Int'l, Inc. v. Nimelias Enters. S.A.*, 250 F .3d 510, 518 (7th Cir.2001). Two suits are parallel "when substantially the same parties are contemporaneously litigating substantially the same issues in another forum."*Clark*, 376 F.3d at 686 (internal quotation marks and citation omitted). The suits need not be identical. *Caminiti and Iatarola, Ltd. v. Behnke Warehousing, Inc.*, 962 F.2d 698, 700 (7th Cir.1992) (internal quotation marks and citations omitted). Rather, contrary to Ingalls's argument that similar facts are irrelevant, the district court should determine whether the suits" arise out of the same facts and raise similar factual and legal issues." *Tyrer*, 456 F.3d at 752.

*3 We agree with the district court that the state and federal proceedings here are parallel. The two suits involve the same parties-Ingalls and AES. The addition of IPALCO, IPL, and Murtlow as defendants in the state case does not destroy the parallel

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2008 WL 896196 (C.A.7 (Ind.))
(Cite as: Slip Copy, 2008 WL 896196)

Page 3

nature of the cases. *See Clark,* 376 F.3d at 686. Importantly, the two suits arise out of the same facts and raise similar factual and legal issues. Although Ingalls argues that his state case focuses on stock options granted to him as incentive compensation while his federal case centers on the stock options he purchased, his amended complaint in the state case and his deposition testimony show that the stock options relevant to the federal claim are central to two of the state court claims. Although the state court disposed of the wages claim, the claim for breach of his employment contract remains. The factual and legal analyses for that claim and the claims in the federal case would be substantially similar. *See Tyrer,* 456 F.3d at 754. Both courts would have to determine the terms of the offer, whether Ingalls accepted the offer, and what, if any, obligations each party incurred. In the course of discovery in the state case, any fraudulent behavior would likely be uncovered, thus reaching the fraud claims in the federal suit. The state court litigation will likely dispose of all claims presented in the federal case, which indicates that the cases are parallel. *See Clark,* 376 F.3d at 686; *see also Day v. Union Mines, Inc.,* 862 F.2d 652, 656 (7th Cir.1988) (state and federal cases parallel when state court would inevitably reach federal case issues even though specific issue not raised in state complaint).

Ingalls's argument that the cases are not parallel because he is seeking different remedies in each case is unpersuasive. His state and federal complaints show that he is actually seeking substantially the same remedies-to be made whole and placed in the same position he would have held but for the breach of employment contract (state case) and breach of the option offer (federal case) plus reimbursement for all financial losses due to **AES's** alleged misconduct. *See Clark,* 376 F.3d at 687 (state and federal suits parallel where plaintiff sought "substantially the same relief" in each). The similarity in the remedies Ingalls seeks suggests that Ingalls has merely repackaged his state complaints in this federal action. *See id.*(state plaintiff cannot repackage "same issue under different causes of action").

Turning to the second step of the abstention analysis, we review for an abuse of discretion whether the district court appropriately applied the 10-factor test to determine if abstention is appropriate. *AAR Int'l, Inc.,* 250 F.3d at 518. On appeal Ingalls does not address the district court's application of the 10-factor test. Because he did not present an argument, let alone develop one, any challenge to the district court's application of the 10-factor test is waived. *See Smith v. Ne. Ill. Univ.,* 388 F.3d 559, 569 (7th Cir.2004).

*4 Regardless, our review of the record convinces us that the district court did not abuse its discretion in holding that abstention was proper. The court must apply the non-exclusive factors on a case-by-case basis. *LaDuke v. Burlington R.R.,* 879 F.2d 1556,1559 (7th Cir.1989). No factor is "necessarily determinative." *Colorado River,* 424 U.S. at 818;*see LaDuke,* 879 F.2d at 1559. In this case, most factors applicable to the situation weigh in favor of abstention. First, the desirability of avoiding piecemeal litigation weighs in favor of abstention. The two courts would be considering the same issues in relation to the 2001 stock option offer and likely hear similar pretrial motions, evidence, and witnesses. *See Clark,* 376 F.3d at 687. Therefore the possibility exists that the courts will come to conflicting decisions in the interpretation of the same transaction. *See Day,* 862 F.2d at 659. Second, the state court obtained jurisdiction more than two years before the federal court, and the state case has progressed further than the federal case. Substantial discovery has been conducted in the state case, and the state court has already made a substantive ruling on one claim. In contrast, the federal case has not moved beyond the abstention issue. These factors therefore weigh in favor of abstention. *See Caminiti and Iatarola, Ltd.,* 962 F.2d at 702;*Lumen Constr., Inc. v. Brant Constr. Co.,* 780 F.2d 691, 696-97 (7th Cir.1986). Third, state law governs all of Ingalls's claims. *See Day,* 862

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2008 WL 896196 (C.A.7 (Ind.))
**(Cite as: Slip Copy, 2008 WL 896196)**

Page 4

F.2d at 660 ("[S]tate court's expertise in applying its own law favors a *Colorado River* stay."). Fourth, because all claims stem from state law, the state court will adequately protect Ingalls's rights. *See Caminiti and Iatarola, Ltd.,* 962 F.2d at 702. Fifth, the state and federal courts have concurrent jurisdiction. *See id.* at 702-03. Finally, Ingalls filed his federal suit just two months after the state court granted partial summary judgment to **AES** on the wages claim, which suggests that the federal suit may be vexatious and contrived. The other factors are either inapplicable or neutral.

AFFIRMED.

C.A.7 (Ind.),2008.
Ingalls v. The AES Corp.
Slip Copy, 2008 WL 896196 (C.A.7 (Ind.))

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.